Filed 7/16/15  P. v. Wilkerson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SCYLER LEE WILKERSON et al.,<br><br>        Defendants and Appellants. | E060059<br><br>(Super.Ct.No. RIF1103080)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Patrick F. Magers, Judge.

(Retired judge of the Riverside Super. Ct., assigned by the Chief Justice pursuant to art.

VI, § 6, of the Cal. Const.)  Affirmed with directions.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and

Appellant Scyler Lee Wilkerson.

Michael Bacall, under appointment by the Court of Appeal, for Defendant and

Appellant Antoine Dwayne Dozier.

1

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendants and appellants Scyler Lee Wilkerson and Antoine Dwayne Dozier (collectively, "defendants") of two counts of robbery (Pen. Code, § 211),[1] two counts of second-degree burglary (§ 459), and active participation in a criminal street gang (§ 186.22, subd. (a)).[2] The jury also found the following special allegations true: (1) that Wilkerson personally used a firearm while committing each of the robberies and burglaries (§§ 12022.5, subd. (a), 12022.53, subd. (c)); (2) that Dozier participated in each of the robberies and burglaries as a principal with knowledge that another principal was armed with a firearm (§ 12022, subd. (a)(1)); and (3) that defendants committed all crimes but the count for participation in a criminal street gang for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).

---

[1] Unless otherwise specified, all statutory references are to the Penal Code.

[2] In addition, the jury found Wilkerson guilty of evading a police officer with wanton disregard for safety (Veh. Code, § 2800.2) and being a felon in possession of a firearm (former Pen. Code, § 12021, subd. (a).) These convictions are not at issue on appeal.

Wilkerson admitted having a 2003 carjacking conviction that qualified as a serious felony conviction, a strike, and a prior prison term conviction. (§§ 667, subds. (c) & (d), 667.5, subd. (b).) Dozier admitted he had both a 2001 carjacking conviction that counted as a serious felony strike conviction[3] and a 2004 conviction for petty theft with a prior theft-related conviction (§§ 667, subds. (c) & (e)(1), 667.5, subd. (b), 1170.12, subd. (c)(1)).

The trial court sentenced Wilkerson to an aggregate term of 35 years. The sentence was chiefly comprised of five years on the first robbery count, doubled because of the prior strike conviction (§§ 667, subd. (e)(1), 1170, subd. (c)(1)), with a 10-year enhancement for using a firearm (§ 12022.5, subd. (b)) and another 10-year enhancement because of the gang findings (§ 186.22, subd. (b)). The court added another five years for the prior prison enhancement (§ 667, subd. (a)). The sentences on all counts other than the first robbery count were stricken, stayed (§ 654), or ordered to run concurrently. In particular, the court indicated it was imposing but striking a six-year term on the count for active participation in a criminal street gang (§ 186.22, subd. (a)). Nonetheless, Wilkerson's abstract of judgment reflects the imposition of a six-year prison term on this count.

---

[3] Dozier filed a petition for writ of habeas corpus on a separate issue related to the use of this juvenile offense at sentencing (case No. E061336). We ordered the habeas corpus petition considered with this appeal. We will resolve that petition by separate order.

As for Dozier, the trial court imposed an aggregate term of 26 years. It reached this sum by imposing the upper limit of five years on the first robbery count, doubled under the three strikes law, with a one-year enhancement for firearm use (§ 12022, subd. (a)) and a 10-year enhancement because the crime was committed to benefit a gang (§ 186.22, subd. (b)). The court then added a five-year prison prior enhancement (§ 667, subd. (a)(1)). As with Wilkerson, the sentences on the remaining counts were stayed (§ 654), stricken, or ordered to run concurrently.

The court ordered identical fees, fines and assessments as to both defendants. As relevant to this appeal, these included a restitution fine in the amount of $240 (§ 1202.4, subd. (b)). In addition, the court ordered defendants not to own or possess any firearm, deadly weapon, or ammunition for the rest of their lives. The minute order contains language to this effect but also prohibits ownership or possession of "related paraphernalia."

Defendants each attack the sufficiency of the evidence supporting the findings regarding gang participation. More specifically, Dozier asks us to reverse both his conviction on the count for participation in a criminal street gang (§ 186.22, subd. (a)) and the gang-related enhancements (§ 186.22, subd. (b)) on the other counts. Wilkerson only requests reversal of the gang-related enhancements (§ 186.22, subd. (b)). We affirm the judgment because we find substantial evidence supports the jury's findings regarding gang involvement.

Wilkerson also challenges some of the other sentencing orders, including the amount of the restitution fine, the lifetime ban on possessing weapons and related

4

paraphernalia, and the mention of a sentence on the gang participation count in the abstract of judgment. The People concede as to these matters. We will direct that the judgment be modified in certain respects as described *post*.

FACTUAL BACKGROUND REGARDING THE CRIMES

On June 14, 2011, a store manager was working at a grocery store called El Toro Market (El Toro). At approximately 8:54 p.m., a woman walked into the market, "checked the store," and left without purchasing anything or speaking to anyone. The store manager had never seen her in El Toro.[4]

At approximately 9:07 p.m., two men entered the store. One wore a red baseball hat and stood in an area near the door. The store manager later identified this man as Dozier.

The other man was wearing a black baseball hat with the letter "T" on it. He pointed a gun at the store manager and told him to open the register. At trial, the store manager identified this person as Wilkerson. Although Wilkerson pointed the gun directly at the store manager, he did it without extending his arm. Two witnesses testified to seeing Wilkerson holding a gun close to his body. However, the gun was not visible in the surveillance video the People played for the jury at trial.

Wilkerson then stepped behind the counter. He told the store manager not to move and took all of the money inside the register. "A hundred dollars or more" were

---

[4] The woman was later identified as Lannea White. The record contains no indication that White was a party to the underlying prosecution; she is not a party to this appeal.

5

present in the register at the time. Defendants then left the store and ran across the parking lot. Dozier told the store manager not to move as he left.

A store cashier immediately called 911. After law enforcement arrived, the cashier identified defendants as the perpetrators during an infield identification.

At approximately 9:15 p.m. on the same night, defendants entered One Stop Food and Water (One Stop). One Stop is only a "couple of blocks" from El Toro. Dozier stood by the door.[5] After grabbing a chocolate, Wilkerson came to the register. He was wearing a "ball cap." Wilkerson jumped the counter and told the cashier to open the register; he had a gun. With the exception of some coins, Wilkerson took all the money, which totaled $500 to $600, from the cash register.

A customer saw the crime in progress and ran to a nearby restaurant, where she asked someone to call the police. A person who had been inside the restaurant went inside the One Stop to check on the cashier, who was a friend of his. After he left One Stop, he saw two men enter the front passenger and rear driver's seats of a red Nissan. The car "immediately started and took off."

Using information received from a radio call, a police officer went to the area in which the red Nissan was believed to be. He saw a red Nissan matching the description that had been broadcast over the police radio. The officer made a u-turn and increased

---

[5] The One Stop cashier was not able to identify defendants' faces by the time of trial and instead described which of them performed which actions based on their relative heights. The record does not reflect which defendant was taller. We were therefore forced to consult the probation reports for information that would have been readily apparent to the jury but which is invisible to us.

his speed to catch up with the red Nissan. A high-speed chase through residential neighborhoods ensued. A helicopter assisted, and officers needed to use spike strips to disable the red Nissan. Eventually, pursuing officers performed a felony stop after the red Nissan came to rest at a gas station. A woman and two men exited the vehicle. At trial, an officer identified the men as defendants.

After the felony stop, police officers asked the One Stop cashier to participate in an infield identification. He identified Wilkerson as the gunman.

EVIDENCE OF GANG AFFILIATION

At trial, the People offered testimony from Richard Mendoza, an officer with the Los Angeles Police Department. He had several years' experience investigating gang crimes and had testified as a gang expert at "well over" 70 preliminary hearings. Regarding gangs generally, Officer Mendoza explained their primary purpose is to "rob and . . . steal and kill people." Gang members "thrive off of intimidation" because it prevents witnesses from identifying suspects or testifying in prosecutions. Young gang members build credibility on the street by "putting in work," or committing crimes such as robbery to benefit a particular gang. However, older gang members need to put in work, too. After all, "You can't be a member of [a] particular gang if you are not committed to the lifestyle."

One "easy way" for gang members to bring money into the gang is "to go out and rob people, whether that be a strong-arm robbery, physically taking their chain or their wallet, or going and robbing them at gunpoint in the street or in a store or market." When gang members take in money that way, it is often "shared amongst" the robbers. In such

7

cases, "initially the benefits are usually monetary to get quick fast money." Gang members also use money brought into the gang to buy narcotics and weapons, which are the "tools of the trade." In this way, when a gang robbery occurs, "the individual [who committed it] benefits monetarily and the gang benefits because that is how they are able to get tools of the trade."

Officer Mendoza had particular experience with the Eight-Trey Gangster Crips (ETG). He described this organization as an active, turf-based criminal street gang that began on 83rd Street in Los Angeles. There are multiple cliques, including the St. Andrews Park and New Orleans Saints cliques, within ETG. ETG tend to wear "different sports apparel," but they tend to prefer apparel displaying the letters "E," "T," or "G." Although the gang used to prefer wearing blue, members now identify themselves as members by "the different types of tattoos they might have on their person or the sports apparel they might wear." ETG also have distinctive hand signs and graffiti, although Officer Mendoza admitted there was no evidence that Wilkerson, at least, had used any of these.

At the time of the crimes described above, law enforcement had documented 500 to 570 members of ETG. Officer Mendoza estimated he had personal knowledge of approximately 300 of these individuals. He testified that police agencies maintain a statewide database of information regarding known gang members. Information enters the database after law enforcement officers complete field identification cards documenting their interactions with gang members. These cards track information such as gang affiliations, types of clothing worn, tattoos, and gang monikers. As Officer

Mendoza noted, however, field identification cards are not completed for every contact an officer has. He stated: "So if you know people or you worked a particular gang for a period of time, you wouldn't—I didn't always fill out a field identification card."

ETG remains based in a particular area of Los Angeles, "but they are not limited to that area per se." Signature crimes of ETG include "vandalism, carjackings, robbery, assaults, both physical and with weapons, narcotic sales, various weapons violations, witness intimidation, [and] murder." Officer Mendoza explained that robberies show that a gang "has a lot of power, and that's how gangs thrive, and respect is everything." He explained: "The committing robbery, especially if it is in another area, your own gang respects you, your rival gang respects you." When respect is present, gangs are better able to recruit "incorrigible youths to join their criminal enterprise." This is because "young incorrigible youths" only want to be part of a gang that has "a lot of power."

Officer Mendoza also testified about defendants, specifically. He said he had had well over a dozen contacts with Dozier. Dozier had even admitted to Officer Mendoza that he was a member of ETG. Dozier has several gang-related tattoos, including: a hand sign on his neck; an "8" on his left triceps and a "3" on his left, which is "very common" among ETG; a "G" and a "C" for gangster crips and "St. Andrews," which is an ETG clique, on his back; and, on his torso, "G" for "gangster" surrounded by the names and hand signs of all the ETG cliques but one of the newest. Dozier's gang moniker was "Lil Greedy." In short, from personal contacts and from reviewing field identification cards completed by other officers, Officer Mendoza "kn[ew Dozier] well." He opined Dozier was an active gang member at the time of the events described above.

9

In contrast to Dozier, Officer Mendoza did not know Wilkerson personally. However, he noted Wilkerson had been "out of the area" for the previous nine years. For the following reasons, Officer Mendoza opined Wilkerson was an active member of ETG on the day of the robberies.

First, after he became aware of this prosecution, Officer Mendoza contacted other police officers and talked to two "other members" to obtain information about Wilkerson's gang status. He used a photograph of Wilkerson to ensure accurate identification. The other officers and the informants they used told Officer Mendoza that Wilkerson used the moniker, "Saint." Because the New Orleans Saints were a clique within ETG, Officer Mendoza had arrested multiple other individuals who also used this moniker.

Officer Mendoza also testified about the appearance and meaning of Wilkerson's tattoos. For example, Wilkerson had a tattoo of a symbol the New Orleans Saints professional football team used on their helmets. The "Saints" were one of the aforementioned cliques within ETG. Like Dozier, Wilkerson had an "8" tattooed on his left triceps and a "3" on right. His right rear triceps also bore the image of a cartoon character with "ETG" on its torso. "[T]he significance of that is the Eight-Trey Gangsters." On his torso, Wilkerson had a tattoo of the text, "St. Andrews Park Gangster Crip," which was yet another clique within ETG. The "G" had a star in the middle of it and an "8" to the left and a "3" to the right. According to Officer Mendoza, one of the ways gang members "glorify their gang membership" was by using "gang stars." Wilkerson's torso also bore a tattoo of a hand with money. Officer Mendoza explained

10

this means, "He has money." Finally, Wilkerson's lower torso had, "ETG for Eight-Trey Gangsters."

Officer Mendoza further testified that Lannea White is "definitely" an associate of ETG. He lacked reliable information showing she was a full member of the gang, but he had "talked to her many times associating with members of [ETG]."

After establishing that Officer Mendoza had reviewed the reports regarding the crimes charged in this case, the prosecutor proposed a hypothetical example in which Officer Mendoza assumed defendants had committed the crimes as alleged. Officer Mendoza responded that, in his opinion, the crimes would have been committed for the benefit of ETG. Again speaking hypothetically, he explained a robbery committed in Riverside County could still benefit a Los Angeles-based turf gang. To thrive and grow by recruiting new members, a gang needs money, power and respect. "The easiest way to do that quickly is through robberies." Robberies create "quick fast money," which initially benefits the individual gang member. Sometimes gangs used money to buy narcotics or weapons to commit more crimes. Robberies outside a gang's claimed territory also yield "instant power," because the gang's members "could go to the other counties and commit crimes without fear of . . . other gang members, because it is a powerful gang." In addition, the individual member committing the robbery "gains respect because [the crime] shows he's committed to the gang lifestyle." The whole gang then benefits, since "young kid[s]" only want to be part of gangs that are powerful. "Even if it doesn't mean they bring any money to the gang, you can throw all of that out, but without committing crimes and without showing that they're powerful and a force to

11

be reckoned with, the gangs would die because you could not recruit younger incorrigible youths." When asked if he could assume word of crimes outside a gang's territory would "get back to people that matter," Officer Mendoza responded, "Of course."

Officer Mendoza additionally stated using a gun in a crime outside of a gang's territory demonstrated how powerful that gang was. Gang members used guns "to rob people or . . . to kill people." Therefore, a gun gives a gang member "ultimate power."

In Officer Mendoza's opinion, leading police on an extended chase involving multiple traffic violations will also benefit a gang. "[I]t is well-known that [gang members] don't fear the law." Running from the police "is an obvious sign" of this lack of fear. Therefore, this activity, "[o]f course," enhances a gang's reputation.

Officer Mendoza acknowledged that not every crime committed by a gang member is a crime committed for the benefit of the gang. He similarly agreed that not everyone who associated with gang members was also a gang member. Officer Mendoza also admitted that Dozier and Wilkerson did not mention ETG during the El Toro and One Stop crimes or demonstrate their gang membership by showing their tattoos, displaying hand signs, or using graffiti. However, he emphasized his opinions about gang affiliation were based on the totality of the circumstances, meaning there are "a lot of different pieces of this puzzle." In particular, "Tattoos are important." For example, a person with gang tattoos who associates with known gang members is highly likely to be an active gang member. In addition, the combination of gang tattoos and a baseball hat with a "T" on it is significant because members of ETG signify their gang membership by wearing athletic apparel with the letters "E," "T," or "G."

12

Although it was possible to leave a gang, Officer Mendoza testified this was not common. In his experience, many people claim to have left their gangs but then continue to associate with gang members. Officer Mendoza explained people who have actually severed ties to a gang "completely disassociate themselves with the gang, they don't hang around with other gang members, and especially they don't commit crimes with other gang members of their particular gang."

At the close of evidence, the People read into the record a stipulation they had reached with defense counsel. As relevant to this appeal, the stipulation established that officers found $211 in the pocket of Lannea White's grey sweatshirt, $86 in Dozier's sock, and $582 in a black jacket in the back seat of the red Nissan. They also found a red baseball hat with a white "W" on it in the rear passenger area of the car, and a black baseball cap with a white "T" on it in the front passenger area.

Defense closing arguments focused on the theory that, even if defendants had gang ties when they got their tattoos, no evidence proved they were still active members of the gang when they committed the El Toro and One Stop crimes. The prosecutor's rebuttal noted there was no evidence either defendant had withdrawn from ETG. At one point, the prosecutor asked, "When have they ever renounced the gang in their actions?" Wilkerson interrupted with: "I will renounce the gang. My bad. Right now I will renounce the gang. In the name of Jesus I will renounce. Right now in Jesus' name."

ANALYSIS

Defendants' contentions about the sufficiency of the evidence at trial fail. For reasons we provide in the first section *post*, substantial evidence supports Dozier's conviction for active participation in a criminal street gang, and the gang enhancements as to both defendants. In the second section, we explain in what ways the judgment must be modified with respect to certain sentencing terms other than the length of imprisonment.

### 1.     *Sufficiency of the evidence:  Standard of review*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60; see also *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 [Fourth Dist., Div. Two] [same standard applies to conviction and enhancement].)

To meet their burden of proof both that a defendant is an active member of a gang and that a crime was committed for the benefit of a gang, the People may rely on testimony from a gang expert. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048 [benefit to gang]; *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509-1510 [active participation].) Gang experts may answer hypothetical questions based on the evidence adduced at trial, even if these questions very closely track the events of the crimes charged. (*People v. Xue Vang* (2011) 52 Cal.4th 1038, 1045.) A conviction for active participation in a criminal street gang or a gang-based sentencing enhancement may not rest solely on testimony from a gang expert. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930-931 [conviction]; *People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 657 [enhancement].) However, expert opinion that is properly supported by other evidence may support a jury's finding that a crime was gang-related. (*Ferraez*, at p. 931; cf. *People v. Ramon* (2009) 175 Cal.App.4th 843, 850-852 [expert opinion not based on extrinsic evidence too speculative and unreliable to support a judgment].)

### a. *Substantial evidence supports the finding that Dozier was an active gang member*

Section 186.22, subdivision (a), creates a substantive offense applicable to, "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang." To qualify as "active," participation in a criminal street gang must be "more than nominal or passive." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130; see also

15

*People v. Castenada* (2000) 23 Cal.4th 743, 752.)  Examples of factors indicating a defendant is an active member of a gang include, without limitation:  having extensive knowledge of gang activities, admitting gang membership to police officers or others, wearing gang colors or gang tattoos, and being in the company of gang members. (*People v. Garcia*, *supra*, 153 Cal.App.4th at pp. 1510-1511 [listing cases].)

Ample evidence supports the finding that Dozier was an active gang member at the time of the robberies and burglaries.  During his more than one dozen contacts with Officer Mendoza, Dozier had admitted being a member of ETG.  Dozier had multiple tattoos associated with ETG, and he had a gang moniker, "Lil Greedy."  In addition, Dozier acted in conjunction with Lannea White, a known gang associate.  He was also in the company of Wilkerson, whom the jury found to have been acting for the benefit of ETG in conjunction with the El Toro and One Stop crimes.  Finally, Dozier committed robberies and burglaries, which are among ETG's signature crimes.  Based on these items of evidence, a reasonable jury could have concluded that Dozier's participation in ETG was "more than nominal or passive."  (*People v. Rodriguez*, *supra*, 55 Cal.4th at p. 1130.)

In attacking the evidence supporting his conviction for active participation in a criminal street gang (§ 186.22, subd. (a)), Dozier argues, "Not being identified as a gang member since 2007 is overwhelming evidence that Dozier was not an active gang member when he committed the robberies" in 2011.  However, he presents no authority showing that recent entries in the law enforcement database are necessary to prove active gang membership.  Moreover, Dozier fails to account for Officer Mendoza's testimony that law enforcement cannot and does not purport to document every contact with a gang

16

member.  Contacts are less likely to appear in the database if the officer knows the gang or the gang member well.  Officer Mendoza had experienced many contacts with Dozier and possessed particular expertise about ETG.  Therefore, the jury could reasonably have assigned little to no weight to the fact that the most recent entry documenting Dozier as a gang member occurred years before the El Toro and One Stop robberies.

Dozier also accuses the People of requiring him to prove he had left ETG even though a criminal defendant bears no burden of proof at trial.  This is because in closing arguments the prosecutor emphasized the absence of evidence that either Dozier or Wilkerson had actually severed all ties to the gang.  While we agree defendant did not need to affirmatively prove anything essential to the People's case in chief, we disagree that is what the People were asking him to do.

Officer Mendoza admitted gang members may disassociate themselves from a gang but indicated this was "not very common."  In his experience, members who had actually left the gang "completely disassociate themselves with the gang, they don't hang around with other gang members, and especially they don't commit crimes with other gang members of their particular gang."  Dozier's committing crimes with another member of ETG is evidence he had not left the gang.  In addition, Officer Mendoza's testimony about the way law enforcement documents contacts with gang members shows that officers tend to stop documenting occurrences that are routine, such as contacts with a familiar gang member.  From this, the jury could reasonably infer that an occurrence as uncommon as a complete disassociation with a gang would be documented.  By pointing to a lack of evidence of disassociation, then, the People were offering affirmative

17

evidence of their own instead of demanding that Dozier produce anything to prove his innocence.

The same reasoning defeats Dozier's complaint that the People argued he "had not disassociated himself from the gang because he had not removed his tattoos." Setting aside that we see no such argument in what the prosecutor said to the jury, we cannot ignore that Dozier chose to get gang tattoos at some point before the El Toro and One Stop crimes. According to Officer Mendoza, "Tattoos are important." In this case, Dozier's tattoos substantiate his admission to Officer Mendoza that he was a member of ETG as of 2007. As we just explained, the absence of evidence of Dozier's disassociation from the gang is evidence that he was still an active gang member when he committed crimes with Wilkerson.

Finally, because one of the reasons Officer Mendoza opined that Dozier was an active member of the gang is that he committed crimes with another active member, Dozier attacks the evidence purportedly showing that Wilkerson was a member of ETG. However, all he argues with specificity is that Officer Mendoza lacked foundation to offer an opinion about Wilkerson's status as a gang member and that the officer relied on unreliable hearsay. At trial, Dozier did not object to Officer Mendoza's testimony on these grounds. He therefore forfeited any claim that Officer Mendoza's testimony was inadmissible because it lacked foundation or relied on hearsay. (Evid. Code, § 353, subd. (a).)

18

If what Dozier argues is that Officer Mendoza's opinion about Wilkerson's active membership in ETG was admissible but too unreliable to count as substantial evidence supporting the verdict, we reject his assertion on the merits. First, Wilkerson's renunciation of the gang in open court informed the jury he was, in fact, an active gang member, since otherwise he would have nothing to renounce. Second, Officer Mendoza was adamant that his opinion about Wilkerson's status in the gang was based on the totality of the circumstances, which included more than just the information the officer learned from others. Moreover, Dozier attacks Officer Mendoza's reliance on statements made by another police officer about what gang contacts told him, but he ignores testimony that Officer Mendoza also personally asked two other gang members about Wilkerson. Even if it was somehow problematic for Officer Mendoza to rely on multiple layers of hearsay, Dozier does not explain why an expert on ETG could not rely on information he received directly from members of the gang. (See, e.g., *People v. Gardeley* (1996) 14 Cal.4th 605, 618 [experts may rely on inadmissible material in forming opinions, "so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions"].)

In any event, even if Officer Mendoza's opinion that Wilkerson was an active gang member was somehow unreliable, Dozier offers no reason why his testimony about Lannea White's connection to ETG was similarly flawed. He does not explain why the jury could not have found Dozier was an active gang member because he had gang tattoos and committed a signature crime of ETG after a known associate of that gang entered El Toro and left without speaking to anyone or buying anything.

19

For these reasons, substantial evidence supports the finding that Dozier was an active member of ETG at the time of the El Toro and One Stop crimes. Dozier makes no other contentions regarding his conviction for active participation in a criminal street gang (§ 186.22, subd. (a)), so we affirm that portion of the judgment.

> **b.** **Substantial evidence supports the findings that Dozier and Wilkerson committed crimes for the benefit of ETG with the specific intent to promote criminal conduct by gang members**

Unlike subdivision (a) of section 186.22, which creates a substantive offense, subdivision (b) of the same statute creates a sentencing enhancement. "This portion of section 186.22 requires proof of only two elements: (1) that the defendant committed a felony for the benefit of, at the direction of, or in association with any criminal street gang; and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613.) The People need not also prove the defendant specifically intended to promote, further, or assist a gang. (*Ibid.*) Although "[n]ot every crime committed by gang members is related to a gang" (*People v. Albillar*, *supra*, 51 Cal.4th at p. 60), "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.)

In this case, the jury received ample evidence connecting the El Toro and One Stop crimes to ETG. First, and as already discussed, substantial evidence supports the conclusion that defendants were both active gang members when the El Toro and One

20

Stop crimes took place. Although neither Wilkerson nor Dozier said the name of ETG, showed their tattoos, or used the gang's hand signs while they committed the El Toro and One Stop crimes, Wilkerson wore a baseball cap with a "T" on it during both sets of offenses. According to Officer Mendoza, this clothing choice connoted an association with ETG, which prefers athletic apparel bearing the letters, "E," "T," or "G." To a person in the know, the commission of one of ETG's signature crimes by someone wearing athletic apparel marked with a "T" would have amply communicated an association with the gang.

Second, robbery is one of the signature crimes of ETG. In addition to potentially giving the gang money to spend on drugs and guns, the commission of an extra-territorial robbery increased the gang's power and respect. That a gang member used a gun further increased the gang's power and respect, which in turn furthers the extent to which "incorrigible youths" looking for a gang to join would find ETG an attractive option.

Even the high-speed chase that followed the El Toro and One Stop crimes helps support the jury's gang findings. As Officer Mendoza explained, "it is well-known that [gang members] don't fear the law." The high-speed chase, which required the use of stop sticks and a police helicopter, demonstrates fearlessness. Dozier's act of calmly telling the El Toro cashier not to move as he left the store demonstrates the same thing. Engaging in actions that communicate a lack of fear of the police helps enhance a gang's reputation, which then helps a gang recruit new members.

Finally, the apparent distribution of the proceeds from the El Toro and One Stop crimes is highly significant. Officer Mendoza gave specific ways in which robberies benefit both individual gang members and the gang as a whole. As he explained, money from a robbery instantly benefits the individual gang members who committed the crime, but it also may be used to buy a gang's "tools of the trade," which are narcotics and weapons. Here, defendants were each in possession of cash when the arrests occurred. This is unsurprising, as gang members often share the proceeds of robberies with each other. What is particularly significant in this case is that White, who did not personally commit any of the crimes, nevertheless had $211 in the pocket of her sweatshirt. This amount is more than double the $86 found in Dozier's sock. The jury could reasonably have concluded that the money White possessed was earmarked for use by the gang, since there was no reason for her to receive funds as a reward for crimes she did not commit.

In each of these ways, substantial evidence supports the finding that defendants committed the El Toro and One Stop crimes for the benefit of ETG. As we have illustrated, specific facts support Officer Mendoza's opinion that the crimes were gang-related. (Cf. *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199 [gang expert must rely on facts and may not "simply inform[]" the trier of fact of his or her belief about the presence or absence of essential elements of a gang enhancement].)

Defendants argue no evidence ties the El Toro and One Stop crimes to ETG because their tattoos were covered when the crimes occurred. Also, they note the People presented no evidence that either Dozier or Wilkerson flashed gang hand signs or marked anything with gang graffiti. What defendants do not do is offer authority requiring any of these behaviors to be present before a crime can be deemed gang-related. As we have already explained, other evidence linking the El Toro and One Stop crimes to ETG is sufficient to support the judgment.

Moreover, even if the People were required to produce evidence that defendants gave visual clues linking their actions to ETG while the crimes were occurring, they successfully did so. As we have already indicated, Wilkerson's black hat, which bore a white "T," implied an association with ETG.

Defendants also attempt to make much of the fact that ETG is based in Los Angeles, but the El Toro and One Stop crimes occurred in Riverside County. They assert the People failed to prove how word of the crimes could have reached interested parties on the gang's home turf. However, reputation is not the only benefit ETG could have received from the robberies and burglaries. As we previously discussed, White's possession of money that appears to have come from the El Toro and One Stop crimes also provides a benefit to the gang. Even if White's money did not benefit ETG in this case, the focus on the location of the crimes is misplaced. "Here defendant[s], . . . admitted gang member[s] sporting gang tattoos, actually committed the robber[ies] with a gang confederate. That [they were] not in [their] gang's territory, by itself, does not

23

necessarily overcome the other supporting evidence." (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1333.)

Dozier's final contention is that the splitting of money between himself, Wilkerson and White proves the crimes were committed for personal gain rather than in an effort to benefit ETG. We view the same fact differently. A discussed *ante*, the way in which Dozier, White and Wilkerson distributed funds between them helps show some of the money was intended to benefit the gang.

### 2    *Corrections are needed with respect to the imposition of fines and other terms of sentencing not pertaining to imprisonment*

Wilkerson argues the restitution fine must be reduced from $240 to $200 because the trial court indicated an intention to impose the lesser amount but erroneously thought it only had discretion to impose the latter. In addition, Wilkerson asserts the lifetime ban on ownership or possession of deadly weapons and "related paraphernalia" is unauthorized for reasons we discuss *post*. His final request is that we modify the abstract of judgment to reflect the striking of the prison term imposed in conjunction with Wilkerson's conviction for active participation in a criminal street gang (§ 486.22, subd. (a).)

The People concede the trial court erred in the latter three respects. They also agree Dozier's restitution fine should be reduced from $240 to $200 even though he made no such argument in his opening brief. We accept these concessions and find merit in Wilkerson's arguments about the restitution fine, lifetime ban on possession or ownership of deadly weapons or related paraphernalia, and inclusion of a six-year sentence on the

24

active participation count (§ 186.22, subd. (a)). As we explain *post*, we will therefore direct the judgment modified in these respects.

### a.     *Defendants' restitution fines must be reduced to $200*

Section 1202.4, subdivision (b), requires the trial court to impose a restitution fine on every defendant who is convicted. Although the amount of the fine rests in the court's discretion, the minimum fine available as of January 1, 2012, was $240. (§ 1202.4, subd. (b)(1).) At the time of the 2011 El Toro and One Stop crimes, however, the minimum fine was $200. (Former § 1202.4, subd. (b)(1), as amended by Stats. 2010, ch. 351, § 9 [effective Sept. 27, 2010].) The trial court stated it intended to impose the "minimum" but erroneously thought that figure was $240. The People concede the increased amount that became effective in 2012 cannot be applied retroactively due to ex post facto principles. (See *People v. Hanson* (2000) 23 Cal.4th 355, 360-362 [restitution fine is punitive]; *Tapia v. Super. Ct.* (1991) 53 Cal.3d 282, 298 [punitive measures may not be applied retrospectively].)

We will direct the trial court to reduce Wilkerson's restitution fine from $200 to match the trial court's intention to impose only the minimum restitution fine. Because the People concede Dozier's restitution fine is also erroneously high, we will direct it be reduced from $240 to $200, as well.

### b.     *The ban on possession of deadly weapons or paraphernalia was unauthorized*

The minute order from Wilkerson's sentencing hearing prohibits him from possessing, for life, "any firearm, deadly weapon, ammunition or related paraphernalia."

25

As supporting authority, the minute order cites section 12021, which has been replaced by section 29800, subdivision (a). (See *People v. Correa* (2012) 54 Cal.4th 331, 334, fn. 1.) The People concede subdivision (a) of section 29800 only prohibits a felon from possessing "any firearm," such that prohibiting possession of any "deadly weapon" or "related paraphernalia" is beyond the scope of the court's authority. We therefore will direct the trial court to delete the prohibition on these two items from Wilkerson's sentence, and to issue a new minute order reflecting the change.

### c. *Wilkerson's abstract of judgment erroneously imposes a term of imprisonment that was stricken*

As indicated *ante*, the trial court imposed a six-year term of imprisonment in conjunction with Wilkerson's conviction for active participation in a criminal street gang (§ 186.22, subd. (a); count 7). However, it then explicitly struck that term. Nevertheless, Wilkerson's abstract of judgment shows a six-year sentence was imposed. We will direct the trial court to correct the abstract of judgment to reflect the striking of this sentence.

### DISPOSITION

The trial court is directed to reduce the restitution fines of both defendants from $240 to $200, to strike terms related to possession of deadly weapons and related paraphernalia from Wilkerson's sentence, to issue a minute order reflecting the striking of these items, and to modify Wilkerson's abstract of judgment to remove the term of imprisonment that was imposed but stricken on count 7 for active participation in a criminal street gang. The trial court is also directed to forward a modified abstract of

26

judgment to the Department of Corrections and Rehabilitation.  In all other respects, the

judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

MILLER
J.

27